265 P.2d 1002

**RASMUSSEN**

v.

**UNITED STATES STEEL CO.**

No. 8081.

Supreme Court of Utah.

Jan. 25, 1954.

C. C. Parsons, A. D. Moffat, Calvin A. Behle, Salt Lake City, for appellant.

Dan S. Bushnell, Salt Lake City, for respondent.

HENRIOD, Justice.

Appeal from a judgment entered on a verdict in favor of plaintiff, who sued defendant on an alleged contract implied in fact for wages due. Reversed, with costs to appellant.

The facts, stated in a light most favorable to plaintiff, and sufficiently for this decision, may be abstracted as follows:

Plaintiff, non-union fuel and power engineer, worked for defendant on a monthly salary basis from January 1947 to December 1950, when he quit. During that period, aside from pay increases for merit, the un-

·ion employees, by negotiated contract, received two general pay raises, one in April, 1947, and another in July, 1948. Shortly after each raise, the company, without negotiation, increased other employees' salaries in an amount that approximately, but not identically corresponded to the union raise. In the first raise, union men were increased 12½ cents per hour, which was followed by a $22 per month increase for non-union employees, including plaintiff. In the second raise, union men were given a 9½ cent hourly increase, and shortly thereafter, supervisory employees were increased 10%, non-union plant employees received $17 per month more, and non-union office employees received a 10% increase, amounting to $26 per month in plaintiff's case. The nature and extent of the disparity of salary increase is apparent from the figures shown. At the time of the second raise the letter announcing the pay increase mentioned that a salary rate inequity program would be undertaken with respect to employees in plaintiff's class comparable to the program theretofore completed for other wage earners. The survey got under way in September, 1950, and plaintiff, at defendant's request, furnished job duty data in October, 1950. On December 1, day after plaintiff voluntarily left his employment, the company announced wage raises for union employees, effective as of November 19, 1950, retroactive to May 1, 1950, as the result of a negotiated contract. The company on its own initiative, however, made the pay increase retroactive to March 9, 1947. On the same day, a notice was posted in the plant informing the employees of the increase, incidentally stating that salary rates and retroactive pay for other non-union employees would be computed in the same manner.

On December 15, 1950, a general raise was given non-union employees, effective December 1, 1950, the announcement thereof mentioning that the salary rate inequity program for non-union employees would be completed shortly and that any adjustment in salary resulting therefrom as to employees in plaintiff's class, would be retroactive to March 9, 1947, for those *who were on the payroll on the date the salary scale became effective*, in this case being June 3, 1951. A news item of December 1, 1950, had quoted defendant's Board Chairman as saying that appropriate adjustments in salaries of employees not under union contract would be made effective as of that date. This item and other announcements of questionable admissibility or relevancy, together with certain letters and notices made it clear that a salary rate inequity program would be worked out for non-union employees, and it is generally conceded that where union negotiated salary increases were obtained, they were followed by pay increases for other employees. Employees of the company and the plaintiff himself testified that they knew of the policy of the company and either hoped for or expected a raise when union members were raised. Plaintiff's counsel, in oral argument con-

cedes that had the company failed to grant the raise or had made such raise retroactive to a date subsequent to plaintiff's resignation, as to all other employees, plaintiff would have no claim against the company.

The first job inequities program conducted by the company was affected in 1947 and applied only to union employees. Another such program was commenced in 1948 as to non-union plant employees, was held up pending a union representation ballot, and was later made effective as of November 19, 1950. In both cases, employees leaving the company between the retroactive and effective dates were paid the increased differential for the time they had worked.

In its simplest form, plaintiff's claim is that the company could not condition its program on the fact that a participating employee of one group be required to be on the payroll at the effective date of the program, when such condition did not attach to other classes of employees. Plaintiff contends that a custom was established by the company requiring it to treat its employees alike with respect to salary increases, that he knew others would get a raise and reasonably could expect to be treated identically as to terms and retroactivity of payment, and that such custom became an integral part of a contract implied in fact.

We believe that as a matter of law there was no implied in fact contract because (1) no custom was shown in a legal sense of that term, and (2) certainty necessary to establish a contract was lacking here.

In the two instances where general salary increases were given, employees were treated differently. In the first instance, they were divided into union and non-union employees. The union raise was negotiated and the non-union was given on the company's own initiative. It seems clear that on that occasion the non-union employees' increase was a matter of grace, not one of right or contract. In the second instance, employees were divided into union, non-union in the plant, non-union in the office, and supervisory. The office group was treated differently than the plant group. Union employees were given an hourly rate increase, non-union plant workers a flat $17 per month, and non-union office and supervisory employees a 10% increase. The disparity of rate increase between members of plaintiff's group and the union people is reflected in figures heretofore mentioned. Certainly the company pursued no course of conduct of that type which would create a custom in the legal sense.[1]

As to lack of certainty, the distinction between express and implied in fact contracts largely is a difference only in mode of expression. A contract is express or implied by reason of the expression of offer and acceptance,—whether there is a manifestation of mutual assent, by words

1. 25 C.J.S., Customs and Usages, § 2, page 78; see Nelson v. Southern Pac. Co., 15 Utah 325, 49 P. 644.

or actions or both, which reasonably are interpretable as indicating an intention to make a bargain with certain terms or terms which reasonably may be made certain. The elements are basically identical in both cases, although the evidentiary facts may be expressed differently.[2] The request by the company that plaintiff furnish job classification data hardly could be interpreted as an offer for a binding contract. At best it would be in the nature of a preliminary negotiation, not an offer to install a program exactly like that given to the employees of an entirely different group.[3] While plaintiff may have expected a contract to result and the company may have intended to put some kind of program into effect, the negotiations and expectations cannot constitute a contract.[4] More reasonably, it would appear from the facts of this case that the company was trying to treat its employees equitably, keeping its own interests in mind, but that no showing was made of any action or conduct that reasonably could be construed as a manifestation of mutual assent showing an intention to be bound on a contract whose terms were certain. So far as the announcements made relating to a salary rate inequity program, they are equally consistent with a contemplated decrease in salary, no increase in salary, or with an assured increase. It would follow, therefore, that it was not unreasonable that defendant condition participation in the program on one's being on the payroll, even though it attached no such condition to members of another class of employees.

As a practical matter, although it may be no legal basis to justify a conclusion that there was no contract implied in fact, if, under the facts of this case a binding contract were held to exist, employers would be discouraged from giving periodic pay raises to the non-union members, and would not be inclined to undertake salary rate inequities programs, knowing that doing it several times would ripen into a contract that would bind them to continue such programs in all future cases where one group was given a raise, negotiated or not. It would tend to destroy the advantages of collective bargaining by forcing the employer to extend the benefits of negotiated contracts to all employees, who may be free from the burdens of union membership, including payment of dues, and who would not suffer the economic disadvantages of loss of employment a union man would suffer during a legitimate strike.

We believe and hold that the trial court erred in failing to direct a verdict on defendant's motion therefor. The judgment is reversed and the cause remanded with instructions to vacate the judgment entered by the court and enter judgment of no cause of action.

McDONOUGH, CROCKETT and WADE, JJ., concur.

WOLFE, C. J., not participating.

---

2. 1 Corbin, Contracts, 33; 1 Williston, Contracts, 6.

3. 1 Williston, Contracts, 52, 59; Restatement, Contracts, Sec. 25.

4. 1 Corbin, Contracts, 14.